UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


------------------------------X
UNITED STATES OF AMERICA      :
                              :
          V.                  :          No. 3:05cr281 (EBB)
                              :
ANTHONY STONE                 :
------------------------------X


## RULING ON DEFENDANT'S MOTION TO SUPPRESS

On November 9, 2005, a federal grand jury sitting in Hartford, Connecticut returned a one-count Indictment charging Defendant Anthony Stone with possession by a convicted felon of a firearm, in violation of 18 U.S.C. § 922(g)(1). The indictment charged the Defendant with possessing four firearms seized during a search of his home on January 8, 2005. On January 9, 2006, Defendant filed a motion to suppress the evidence seized during this search. This court held an evidentiary hearing on Defendant's motion on the following six dates: November 20, 2006, January 11th, 24th and 26th of 2007, and February 21st and 28th of 2007. Based upon the evidence presented to this court, and for the reasons set forth below, Defendant's Motion to Suppress [Doc. No. 16] is DENIED.

### FINDINGS OF FACT

On January 8, 2005, at approximately 9:30 a.m., Defendant's wife Tayarisha Stone ("Tayarisha") called the Windsor Police Department to ask for a restraining order against her husband.

Govt. Ex. 15A. Tayarisha stated that the Defendant had told her "I'm gonna kill you and police and you know nobody can, can stop me." Id. Tayarisha indicated that she was at her mother's apartment, located at 646C Windsor Avenue, and the police dispatcher receiving the call told her that an officer would meet her at that location. Id. Officer Kari Tkacz of the Windsor Police Department was dispatched to 646C Windsor Avenue, and took a sworn statement from Tayarisha at approximately 10:00 a.m. In her statement, Tayarisha indicated that her residence was 157 Henry Street. She also stated the following: (1) she had been separated from her husband for one week, (2) her husband had kicked her out of [157 Henry Street] after a fight, (3) she decided to leave because she "[knew] how [the Defendant] can be", (4) the Defendant "had always been very verbally abusive towards me . . . He has also said he'd kill me before he let me leave", (5) she had moved in with her grandparents at 120 Highland Avenue, (6) the Defendant had repeatedly called her phone asking her to come home, and that "in the past 12 hours, [Defendant] has called my cell phone 23 times", (7) at 8:30 p.m on January 7, 2005, the Defendant made the first of three threats to kill Tayarisha if she did not come home within the hour and (8) the last of these threats was at approximately 9:15 a.m. on January 8, 2005. Govt. Ex. 1

At the evidentiary hearing, the United States (hereinafter

the "Government") called as witnesses the following law enforcement officers from the Windsor Police Department: Officer Kari Tkacz, who took Tayarisha's first statement and accompanied her the morning of January 8, 2005 to 157 Henry Street, Sergeant William Freeman, who provided backup for Officer Tkacz, Detective Michelle Neary, who met with Tayarisha the afternoon of January 8, 2005, and Officer Justin Kaldey, who helped prepare the search warrant application for the Defendant's residence at 157 Henry Street. The Government also called Special Agent James Hartman of the Bureau of Alcohol, Tobacco and Firearms. Their testimonies, which the court finds consistent and credible, recounted the events of January 8, 2005 and the subsequent investigations as follows:

After Tayarisha's first statement (recounted above) was taken, Tayarisha asked Officer Tkacz to accompany her to 157 Henry Street while she retrieved her personal belongings. Vol. 1 at 23[1]. Officer Tkacz called her supervisor, Sergeant Freeman, for assistance. Sergeant Freeman and Officer Tkacz drove in separate vehicles to 157 Henry Street, where they met Tayarisha and her mother. Before entering the house, Sergeant Freeman asked Tayarisha if there were any weapons inside. Vol. 1 at 25; Vol. 4 at 137, 260-61. Tayarisha told the officers that she believed there were firearms in the home. Id. The officers entered the

_____

[1]All references to "Vol" relates to the trial transcript.

house through a door off the deck, without forcing entry. Vol. 1 at 25 (Officer Tkacz testifying that the door was unlocked); Vol. 4 at 138 (Sergeant Freeman testifying that either Tayarisha or the officers opened the door, but that there was no forced entry). The officers entered with their guns drawn and proceeded to do a cursory sweep of the premises. Once they established that the Defendant was not on the premises, Tayarisha entered. Vol. 4 at 138-39. The officers then asked Tayarisha "where the guns would have been if [the Defendant] were to keep them around," Vol. 4 at 139. Tayarisha responded that she believed there was a gun in the hallway closet, and pointed to the closet. Vol. 1 at 27. Officer Tkacz opened the closet door, saw a .44 caliber gun on the shelf of the closet, and seized it. Vol. 1 at 28. The officers then asked Tayarisha if there were any more firearms in the house. Id. Tayarisha stated that she believed there was another gun in the house, and went upstairs to the master bedroom. Vol. 1 at 29, Vol 4. at 144. Sergeant Freeman accompanied Tayarisha upstairs, where Tayarisha pulled a Smith and Wesson handgun case out of a dresser drawer and handed it to him. Vol. 4 at 144-45. Sergeant Freeman opened the case and found a semiautomatic .45 caliber magazine and 52 rounds of .45 caliber ammunition, but no weapon. Vol. 4 at 147. Both the .44 caliber gun and the .45 caliber case, magazine and ammunition were secured in the trunk of Officer Tkacz's patrol car. Vol. 1 at 29;

4

Vol. 4 at 148. The officers then left the premises and returned to the stationhouse. Vol. 1 at 31-32; Vol. 4 at 151.

The officers testified that they then proceeded to look for the Defendant. Officer Tkacz called the Defendant's cell phone and went to 120 Highland Avenue (where Tayarisha had been staying with her grandparents) to see if the Defendant was there. Vol. 1 at 36. A message was put out over the mobile data terminals, which was sent to other police departments. Other patrol officers were assigned to watch 157 Henry Street and 120 Highland Avenue. Vol. 4 at 152-53. Meanwhile, Officer Tkacz performed a criminal history check on the Defendant, which indicated that he had been arrested for Risk of Injury and Sexual Assault in the 2nd Degree on October 29, 1995, and convicted of Risk of Injury, a felony conviction, on March 20, 1996. Vol. 1 at 40; Govt. Ex. 4B. Officer Tkacz also performed an "in-house" history check of the Defendant to see if he had had any prior interactions with the Windsor Police Department. Vol. 1 at 41. She found a "CAD" activity report (a dispatch report) showing that the Defendant had been arrested for a domestic disturbance on August 26, 2003. Vol. 1 at 43; Govt. Ex. 5B.

Officer Tkacz then prepared a search warrant application to search 157 Henry Street for a Smith and Wesson .45 caliber handgun and ammunition. Govt. Ex.8. The application for the search warrant was based on the Defendant's threats to his wife,

the evidence that the Defendant possessed firearms, and the fact that the Defendant was previously convicted of Risk of Injury to a Minor, a felony. Id. The warrant was granted that afternoon. Govt. Ex. 8.

Detective Michelle Neary proceeded to 120 Highland Avenue, where Tayarisha had been staying with her grandparents, to ask for a key to 157 Henry Street for the execution of the search warrant. Vol. 5 at 89-90. Detective Neary could not recall who at 120 Highland provided her with a key, but she recalled providing the key to Sergeant Freeman. Vol. 5 at 146, 150.

Before the warrant was executed, the Defendant was arrested at 120 Highland Avenue. Vol. 1 at 61. After arresting the Defendant, officers proceeded to 157 Henry Street and executed the search warrant, where they found five firearms in various locations in the basement of the house. The officers found a Maverick 12 gauge sawed-off shotgun and a loaded Marlin 9mm caliber rifle in an unlocked closet, a loaded Ruger .357 Magnum revolver and a Smith & Wesson .45 caliber pistol in an unlocked cabinet, and a loaded Smith & Wesson .22 caliber pistol under a couch cushion in the basement. Govt. Ex. 10. Id.

The officers testified that 157 Henry Street appeared to be a single family home (see Vol. 1 at 35-35; Vol. 4 at 149-150, 169; Vol. 5 at 41-42. The basement, where the weapons were found, contained a television, 2 couches, a video game unit, and

childrens' items. Govt. Ex. 10.

**A. The Morning Search**

Defendant argues that the warrantless morning search of his residence was a violation of his Fourth Amendment rights. He claims that his estranged wife, Tayarisha, was not authorized to give consent to search the residence, nor did the officers have a reasonable basis to believe that she was authorized to give consent. The Government, on the other hand, claims that the search was conducted lawfully pursuant to the consent of Tayarisha, who had actual authority to consent, or whom the officers reasonably believed to possess the requisite authority. Applying the tests set forth in U.S. v. Matlock, 415 U.S. 164, 94 S.Ct. 988 (1974) and Illinois v. Rodriquez, 497 U.S. 177, 110 S.Ct. 2793 (1990), the Court finds that Tayarisha had actual authority to consent and that her representations and the surrounding circumstances made it reasonable for the officers to conclude that she had such authority.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Under the Fourth and Fourteenth Amendments, a warrantless search is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Katz v. United

<u>States</u>, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967). "One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44 (1973). Such consent must be "freely and voluntarily given", and the question of whether a consent to search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. <u>Id</u>. at 222, 226, 93 S.Ct. at 2047-48. In applying the "totality of the circumstances" test, the Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." <u>Ohio v. Robinette</u>, 519 U.S. 33, 34, 117 S.Ct. 417, 419 (1996). Factors that courts consider in assessing the voluntariness of a consent include the individual's age, intelligence and educational background, the length and nature of the questioning, and whether the law enforcement officials engaged in coercive behavior. <u>United States v. Jones</u>, 154 F. Supp. 2d 617, 621 (S.D.N.Y. 2001), <u>citing</u> <u>Scheneckloth v. Bustamonte</u>, <u>supra</u>, 412 U.S. at 226-27, 93 S.Ct. at 2047; <u>see</u> <u>also</u> <u>United States. v. Mendenhall</u>, 446 U.S. 544, 100 S. Ct. 1870 (1980) (finding requisite voluntary consent where defendant was 22 years old, had an eleventh grade education, and was capable of a knowing consent). The prosecution bears the burden of showing,

by a preponderance of the evidence, <u>United States v. Buettner-Janusch</u>, 646 F.2d 759, 764 (2d Cir.), <u>cert. denied</u>, 454 U.S. 830, 102 S.Ct. 126 (1981), "'that the consent was, in fact, freely and voluntarily given.'" <u>Schneckloth</u>, 412 U.S. at 222, 93 S.Ct. at 2045, <u>quoting Bumper v. North Carolina</u>, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792 (1968).

The Supreme Court has extended the consent exception to include consent by third parties, where that third party "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." <u>U.S. v. Matlock</u>, 415 U.S. 164, 171, 94 S.Ct. 988, 993 (1974). "Common authority" is based upon "the mutual use of the property by persons generally having joint access or control . . . so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right." <u>Id</u>. at 172 n.7. In the Second Circuit, third party consent will validate a warrantless search only if (1) the third party had access to the area searched and (2) the third party had either (a) common authority over the area or (b) a substantial interest in the area or (c) permission to gain access. <u>United States v. Davis</u>, 967 F.2d 84, 87 (2d Cir. 1992); <u>see also United States v. Gradowski</u>, 502 F.2d 563, 564 (2d Cir. 1974) (per curiam); <u>United States v. Trzaska</u>, 859 F.2d 1118, 1120 (2d Cir. 1988), <u>cert. denied</u>, 493 U.S. 839, 110 S.Ct. 123 (1989).

Here, Tayarisha had access and common authority over the premises at 157 Henry Street. First, the officers present at the morning search consistently testified that when they arrived, Tayarisha and her mother were already there, and that the door was either unlocked, or Tayarisha opened it herself. There was no evidence of forced entry, and Tayarisha retained a key to the house, which the officers used in their afternoon search. In short, the evidence establishes that Tayarisha had access to 157 Henry Street. In fact, even if the door had been locked, although, "no case in [the Second Circuit] has delineated the requisite 'access' necessary to satisfy the first prong of the Davis test," Ehrlich v. Town of Glastonbury, 348 F.3d 48, 53 (2d Cir. 2003), "neither has the Circuit ever adopted as the clear law of this circuit . . . that access must mean physical access and not legal access." Id. at 60.

Turning to the second prong, Defendant argues that Tayarisha, as an estranged wife, did not have common authority over the house at 157 Henry Street.

In Illinois v. Rodriquez, the Supreme Court, in establishing the rule of apparent common authority, determined that the third party in question, the girlfriend of the defendant, lacked common authority over the defendant's apartment. The Court based this determination on the combination of the following factors: (1) the girlfriend had only lived with the defendant for 6 months,

(2) she moved out almost a month before the search at issue, (3) she took her and her childrens' clothes with her, (4) she had not contributed to the rent, nor was her name on the lease, (5) she had a key to the apartment which may or may not have been taken without the Defendant's knowledge and (6) although she sometimes spent the night at the Defendant's house after she moved out, she never invited her friends there, and never went there herself when he was not home. Illinois v. Rodriquez, 497 U.S. 177, 181-82, 110 S.Ct. 2793, 2797-98 (1990).

The facts of this case are readily distinguishable, and are analogous to the facts of United States v. Trzaska. In Trzaska, the Second Circuit found that an estranged wife had third party authority to consent to a search of the marital home where the wife (1) had moved out two weeks before, (2) still possessed a key to the apartment (although she had to retrieve it from a family member) and (3) collected personal belongings from the marital home during the search.[2] United States v. Trzaska, 859 F.2d 1118, 1120 (2d Cir. 1988).

_____

[2]Defendant suggests that Trzaska might have been decided differently had it come after Rodriquez. However, as is evident above, the facts in Trzaska were sufficiently distinguishable from the facts in Rodriquez. Moreover, although there have not been any cases in the Second Circuit since Trzaska specifically addressing the case of an estranged wife giving third-party consent, Trzaska has been cited approvingly and its rationale followed in at least one sister circuit that has been presented with nearly identical facts. See, e.g. United States v. Shelton, 337 F.3d 529 (5th Cir. 2003) (holding that estranged wife had authority to consent to search of marital residence occupied by defendant where wife left home one week earlier, left behind some belongings and kept house key, and also noting that post-Matlock, the "joint access or control" test for third party consent has led to very fact-oriented precedents).

11

Here, at the time of the morning search, Tayarisha had been married to the defendant for seven years, had two children with him, had been living with him at the location of the search for six years, and had left the home just one week before the search. She also had returned to the home on several occasions in the week prior to the search to pick up her personal belongings, still had personal belongings in the home, and continued to receive mail at the home.[3]  Vol 6. at 12-13.

All of these facts show a much more substantial connection to the premises searched than that of the defendant's girlfriend in Rodriguez, and establish that Tayarisha possessed common authority over 157 Henry Street and the power to consent to its search.

Assuming *arguendo* that Tayarisha did not possess the requisite third party authority to consent, the search was nonetheless valid because the officers reasonably believed that she did.  Where a third party lacks actual authority to consent to a search, that party's consent is nonetheless effective where law enforcement "reasonably (though erroneously) believe[d]" that the third party had authority to consent. Illinois v. Rodriguez,

___

[3]The Defendant notes that the residence at 157 Henry Street was solely in the Defendant's name. This is not a determinative factor in determining common authority. In Matlock, the Supreme Court expressly downplayed the significance of property ownership when deciding whether a third party possessed common authority to consent, stating that "[t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements").  415 U.S. at 171, n. 7, 94 S.Ct. at 993.

497 U.S. at 186, 110 S.Ct. at 2800.

"Determination of consent . . . must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" Id. at 188, 110 S.Ct. at 2801, quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880 (1968).

In the present case, the facts available to the officers at the time of the morning search justified their reasonable belief that Tayarisha had authority to consent. The sworn statement that Tayarisha gave to the police just prior to the search stated that 157 Henry Street was her home, that she had just been kicked out a week earlier and that the Defendant was threatening to kill her unless she came "home" [which presumably meant the family home].

Finally, Tayarisha's consent was voluntary. Voluntary consent "need not be expressed in any particular form, but 'can be found from an individual's words, acts, or conduct.'" United States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993), quoting Krause v. Penny, 837 F.2d 595, 597 (2d Cir. 1988.) "Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: you have my permission to search." United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981).

In the present case, the totality of the circumstances indicate that Tayarisha voluntarily consented to the morning search. Tayarisha contacted the Windsor police herself and asked them to accompany her to 157 Henry Street so that she could collect her personal belongings. When the officers asked Tayarisha if the Defendant kept any guns in the house, she freely responded that she believed there was a gun in the closet, and pointed to the closet. Vol. 4 at 139. This gesture was reasonably interpreted by the offices as extending permission to open the closet to see if a gun was in fact there. When officers asked if there were any other guns in the house, Tayarisha went upstairs on her own accord. Even if this court were to credit the Defendant's allegation that the officers requested that she go upstairs and retrieve the other gun, see Vol. 4 at 205, 210 there is no evidence that Tayarisha did not voluntarily consent. Nor is there any evidence that, after finding the Smith & Wesson case, the officers questioned Tayarisha about any other weapons while they were in the house. In short, the police conducted a very limited search, directed by Tayarisha, who freely gave her consent.

For the foregoing reasons, this court finds that the morning search of the premises at 157 Henry Street was valid pursuant to the consent exception of the Fourth Amendment's prohibition against warrantless searches and seizures. Therefore, this court

need not address the Defendant's arguments that the seizure of firearm and ammunition in the morning search were not justified under the plain view and protective sweep doctrines.

## B. The Afternoon Search

Defendant argues that the afternoon search of 157 Henry Street, which resulted in the seizure of the four weapons charged in the indictment, was unlawful for a number of reasons. He claims that (1) the warrant authorizing the afternoon search was tainted by the "illegal" morning search, (2) the affidavit accompanying the search warrant contained false statements and omissions made knowingly, intentionally, or with reckless disregard for the truth, (3) the search warrant violated the particularity requirement of the Fourth Amendment and (4) the actual search exceeded the scope of the warrant. The court addresses each of these arguments in turn.

First, because the court finds that the morning search of Defendant's residence was valid, it need not address the Defendant's first argument – that the warrant was "tainted" by the morning search.

Second, Defendant asserts that the affidavit in support of the search warrant "intentionally, knowingly and with reckless disregard for the truth omitted essential elements known to the affiants which, if disclosed to the court, would have resulted in its refusal to issue the search warrant." [Doc. No. 30].

Specifically, Defendant alleged through cross examination that the affiants made the following false statements: (1) that the Defendant had "[a] history of the use, attempted use, or threatened use of physical force . . . against other persons" (See Vol. 1 at 89-91), (2) that the Defendant's felony conviction for Risk of Injury supports a history of use, attempted use, or threatened use of physical force (See Vol. 1 at 89-91), (3) that the Windsor police had prior contact with the Defendant and his wife Tayarisha for domestic violence (See Vol. 3 at 41-43), (4) that the Defendant "is a convicted felon from an arrest in 1996 (class C felony, sexual assault 2nd)" (See Vol. 3 at 73) and (5) that the defendant posed a risk of imminent personal injury to himself or to other individuals. (See Vol. 3 at 45).

As a preliminary matter, "[e]very statement in a warrant affidavit does not have to be true." United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000) (internal citation omitted). A truthful showing "does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct . . . but surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." Franks v. Delaware, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681 (1978). In other words, the dispositive issue is not whether the affiant included an incorrect fact in his statement, but whether he appropriately concluded that the

fact was true.

Where a defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause," the Fourth Amendment requires the court to grant a hearing upon the Defendant's request. Franks v. Delaware, 438 U.S. 154 at 155-56, 98 S.Ct. at 2676, accord United States v. Singh, 390 F.3d 168, 181 (2d Cir. 2004). This showing must be "more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Franks v. Delaware, 438 U.S. at 171, 98 S.Ct. at 2684.

Even if a defendant can show the above, he must also show that false statement or omission was necessary or material to the finding of probable cause. In other words, if probable cause exists in the warrant once the allegedly deliberately false or reckless statement is discounted, no hearing is required. Id. at 171-72, 98 S.Ct. at 2684. "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" United States v.

<u>Canfield</u>, 212 F.3d 713, 718 (2d Cir. 2000), <u>quoting</u> <u>United States</u>
<u>v. Ferguson</u>, 758 F.2d 843, 849 (2d Cir. 1985).

In the present case, Defendant has not established that the
challenged statements, even those that could be characterized as
inaccurate or incorrect, were made with deliberate falsehood or
reckless disregard for the truth. Based upon Defendant's threats
to Tayarisha and the fact that they found a firearm at his
residence, it was reasonable for the officers to state that the
Defendant posed a risk of imminent injury to others. In addition,
although the domestic dispute referenced in the affidavit
referred to an incident between the Defendant and another woman,
because the case had been suppressed, the only information
available to Officer Tkacz at the time was that there had been a
domestic disturbance at 157 Henry Street and that the Defendant
had been arrested. (Vol. 1 at 46). Thus, it was reasonable for
her to conclude that the Defendant's wife was the other party.
Finally, Defendant argues that the statement that he "is a
convicted felon from an arrest in 1996 (class C felony, sexual
assault 2nd), which was in the incident report accompanying the
warrant application, was incorrect because it implied that he was
convicted of Sexual Assault, not Risk of Injury to a Minor. (<u>See</u>
Vol. 3 at 71-73). However, Officer Tkacz, who made the statement,
testified that the parenthetical was modifying the arrest, not
the conviction. This testimony is consistent with the rest of

the search warrant application, where Officer Tkacz simply stated that "A. Stone has a felony conviction from 1996 for Risk of Injury, 53-21." Govt. Ex. 8.

In sum, the Defendant has not met his burden of showing that a false statement was made knowingly or intentionally, or with reckless disregard for the truth.

Third, Defendant argues that the search warrant violated the Fourth Amendment's particularity requirement because it only listed one gun to be seized, despite the fact that Tayarisha had described other guns she believed to be in the house. The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Defendant cites Justice Stewart's plurality opinion in Coolidge v. New Hampshire, 403 U.S. 443, 91 S. Ct. 2022 (1971) to support his claim that failing to include contraband that an officer knows might be on the premises violates the particularity requirement. However, Justice Stewart's opinion, which was joined by only 3 other Justices, was expressly rejected by the Supreme Court in Horton v. California, 496 U.S. 128, 110 S. Ct. 2301 (1990). There, the Court held that the warrantless seizure of evidence of crime in plain view, even if not inadvertent, was not prohibited by the Fourth Amendment. Horton v. California, 496 U.S. 128, 130, 110

S. Ct. 2301, 2304 (1990). "The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." 496 U.S. at 138, 110 S. Ct. at 2309. Thus, the officers' failure to include the guns Tayarisha had described to them in the warrant application did not violate the particularity requirement of the Fourth Amendment.

Finally, the Defendant argues that the afternoon search exceeded the scope of the warrant because the officers continued searching after seizing the Smith & Wesson .45 caliber handgun listed in the warrant. As a preliminary matter, this court notes that it is unclear in what order the weapons were discovered and seized.[4] However, assuming *arguendo* that the .45 caliber handgun was recovered first, the warrant expressly authorized the officers to continue to search the home for ammunition. In the process of the search, the officers were authorized to look anywhere where the ammunition could reasonably have been found. See <u>United States v. Ross</u>, 456 U.S. 798, 820-21, 102 S.Ct. 2157,

---

[4] Defendant relies on the time written on the evidence tag of each weapon as an indication of when it was seized. However, Officer Kaldey, who tagged the evidence, and Detective Neary, who assisted him, both testified that the documentation on the tag was in reference to when the officer tagged the weapons, and not necessarily when the evidence was actually seized by the recovering officer. <u>See</u> Vol. 5 at 143; Vol. 5. at 232 ("I can tell you what time they were surrendered to myself, yes sir. I can't tell you what time they were actually picked up by the recovering officer.")

2170-71 (1982) (stating that "a lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."). In addition, the officers could properly seize any evidence whose criminal nature was immediately apparent, such as a firearm. See Horton v. California, 496 U.S. 128, 142, 110 S.Ct. 2301, 2310-11 (1990).

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Evidence [Doc. No. 16] is DENIED.


SO ORDERED.


_____

ELLEN BREE BURNS, SENIOR JUDGE

UNITED STATES DISTRICT COURT


Dated at New Haven, Connecticut, this ___ day of September, 2007.